Francisco MARTINEZ, Plaintiff,

v.

MARIN SANITARY SERVICE, Joseph Garbarino Sr and Does 1 through 20, inclusive, Defendants.

No. C 01–3410 VRW.

United States District Court, N.D. California.

Feb. 23, 2004.

Peter J. Johnson, Johnson & Johnson, Pittsburg, CA, for Plaintiff.

Ivo M. Labar, James M. Wagstaffe, Kerr & Wagstaffe LLP, Jennie Lau, Lindbergh Porter, Jr., Allen Matkins Leck Gamble & Mallory LLP, San Francisco, CA, for Defendants.

## ORDER

WALKER, Chief Judge.

Defendants Marin Sanitary Service (MSS) and Joseph Garbarino Sr (Garbarino Sr) move the court for summary adjudication of plaintiff Francisco Martinez' (Martinez) sole federal claim and to decline supplemental jurisdiction over and dismiss Martinez' remaining state claims. Doc # 42. In opposition to the motion, Martinez relies heavily upon his declaration dated January 14, 2004, and to a lesser extent on his February 15, 2002, deposition testimony. Although the facts recited in Martinez' declaration and in his deposition testimony are consistent on some matters, the facts recited in the declaration and those in the deposition testimony are materially different in a number of respects. Relying on these inconsistencies, defendants invoke the sham affidavit rule and certain other evidentiary rules to narrow the grounds upon which Martinez can rely to create a triable issue of fact and defeat summary judgment. Despite such narrowing, Martinez' facts are nevertheless sufficient to survive defendants' motion for summary judgment on all but one of his claims.

### I

The facts as presented by Martinez include substantial inconsistencies. In opposition to the motion for summary judgment, Martinez presents both his February 2002 deposition testimony and his January 2004 declaration. Although the two versions of Martinez' testimony are consistent with respect to three events that took place in August and September 2000 (the "fall 2000 events"), the two versions are materially different.

Specifically, Martinez' declaration contradicts his deposition testimony regarding events that took place before the year 2000. Martinez' declaration also contradicts his deposition testimony regarding events that took place subsequent to the fall 2000 events.

## A

Martinez is a Mexican–American sanitation worker who has been employed with defendant MSS in San Rafael, California, for approximately twenty-five years. Pl Compl (Doc # 1) at 2–3 ¶¶ 3, 6, 11. During the course of this lawsuit, Martinez has continued to be so employed. See id at 3 ¶ 11; Depo Francisco Martinez (Martinez Depo; Decl Ivo Labar (Labar Decl; Doc # 40) at 1 ¶ 3, Exh A; Decl Peter Johnson (Johnson Decl; Doc # 44) at 4 ¶ 10, Exh I) at 6:16–18. Martinez alleges that during the course of his employment with MSS, he repeatedly requested that MSS promote him to a position as a debris box delivery driver; MSS, however, refused to do so. Id. at 3 ¶ 11. Martinez claims that MSS consistently filled his requested job positions with individuals who were not Latinos, and that MSS assigned its Latino employees to the "less desirable" job positions. Id. at 3–4 ¶¶ 12, 15. Although Martinez believes that he last applied for a position as a debris box delivery driver sometime between 1998 and 2002, he does not know exactly when he last applied for such a position. Martinez Depo at 49:3–13. Martinez also alleges that he frequently experienced offensive racial slurs in the MSS workplace. Pl Compl at 3 ¶ 14.

### Martinez' Declaration: Before the Fall 2000 Events

In conjunction with his opposition to the motion for summary judgment, Martinez presents a declaration. Doc # 46 (Martinez Decl; docketed as "AFFIDAVIT"). Martinez' declaration is dated January 14, 2004. Id. at 12:19. Martinez asserts in his declaration that he has "heard comments and jokes" directed toward all Latinos throughout his employment at MSS. Martinez Decl at 1 ¶ 3. Martinez further asserts that he began to notice in about 1996 that more derogatory statements about Latinos were being made at MSS. Id. at 1–2 ¶¶ 3–5. Martinez believes that this coincided with defendant Garbarino Sr taking the position of garbage collection supervisor. Id. at 2 ¶ 5. Garbarino Sr is one of the founders of MSS and has been working in the sanitation business for several decades. Depo Joseph Garbarino Sr (Garbarino Sr Depo; Labar Decl at 1 ¶ 4, Exh B; Johnson Decl at 3 ¶ 7, Exh F) at 11:9–10. Among the offensive terms and phrases that Martinez declares he heard from Garbarino Sr are "fucking Mexican," "porko Mexicano," "stupid Mexican," "I hate Mexicans," "Mexican fag," "I am going to fire all the Mexicans" and other offensive references to Latinos as a group, such as "all you Mexicans" or "all of you." Martinez Decl at 2 ¶ 6. Martinez claims that he "cannot pinpoint how many times [he] heard a derogatory comment made referring to Mexicans." Id. at 2 ¶ 7. Such comments, according to Martinez, were made by Garbarino Sr with sufficient regularity that they were simply part of the working environment for Martinez during these years. Id. Martinez declares that these comments were made directly to him or in front of him to and about others. Id. at 2 ¶ 9. Martinez also declares that he has been told by other employees that they have heard racially charged comments. Id.

In the late 1990s, Martinez asserts in his declaration that he witnessed Garbarino Sr berate several Latino employees with racial slurs. Id. at 6–7 ¶¶ 22–25. Martinez declares that he heard Garbarino Sr use

racial epithets when talking to several specific employees. In 1998 or 1999, Martinez heard Garbarino Sr tell Luis Morales, "I hate fucking Mexicans." *Id.* at 6 ¶ 23. Also in 1998 or 1999, Martinez asserts that he heard Garbarino Sr tell Geraldo Luna, "I hate Mexicans." *Id.* at 7 ¶ 24. And in 1997 or 1998, Martinez asserts that he heard Garbarino Sr yell at Raul Camacho and use derogatory terms regarding "Mexicans." *Id.* at 7 ¶ 25. Beginning in 1998, Martinez began to "speak up" when he heard Garbarino Sr make a derogatory remark about Latinos. *Id.* at 2–3 ¶ 10. Typically, after Garbarino Sr insulted a Latino co-worker, Martinez would wait until the co-worker had left and then would ask Garbarino Sr not to speak about Mexican workers in that fashion or would remind Garbarino Sr that he, Martinez, was of Mexican descent. Martinez Decl at 1–2 ¶¶ 10–11.

### Martinez' Deposition: Before the Fall 2000 Events

Martinez' deposition testimony, taken in February 2002, is inconsistent in significant respects with the recital of events in this January 2004 declaration. In his deposition, Martinez did not testify to hearing comments and jokes about Latinos throughout his employment. Rather, Martinez testified that "the problem started with Mr Garbarino" in the year 2000. Martinez Depo at 10:11–16. Martinez also testified, when asked what actions and events "traumatized" him, that such events "[m]ainly start[ed] with the year 2000." *Id.* at 12:9–11. Martinez does not describe overhearing any incidents in which Garbarino Sr used racial epithets prior to the year 2000. Rather, Martinez testified that, at some point in the year 2000, he heard Garbarino Sr refer to another employee as a "fucking Mexican" and that Martinez reminded Garbarino Sr that he, Martinez, was also of Mexican descent.

Martinez Depo at 12:9–17, 78:19–79:7. Martinez does not mention the incidents involving Morales, Luna or Camacho. With respect to hearing secondhand information regarding Garbarino Sr's verbal outbursts, Martinez testified about the experience of only one other individual: Martinez stated that his brother, Leonardo Martinez, had told him at some point in 1998 or 1999 that he had heard Garbarino Sr use the term "fucking Mexican." *Id.* at 61:8–24.

### Martinez' Deposition and Declaration: the Fall 2000 Events

Martinez' deposition testimony and his declaration are largely consistent with respect to three events that occurred in the fall of 2000. The first of those incidents occurred in August 2000. On that occasion, Martinez returned to the MSS yard after completing his route and was confronted by Garbarino Sr, who said, "You stupid Mexican, you threw away things that were not garbage." Martinez attempted to explain that the property in question had been placed next to a garbage dumpster. Garbarino Sr was not interested in Martinez' explanations and responded, "That's why I hate fucking Mexicans." Garbarino Sr then threatened to fire Martinez and said that Martinez would have to pay for the lost property. Martinez retrieved the property and showed it to Garbarino Sr, at which point Garbarino Sr said, "You Mexican fag, I am going to make you pay for this and I am going to fire you." Martinez Depo at 74:23–77:6; see also Martinez Decl at 5 ¶ 20. This incident was witnessed by Martinez' cousin, Francisco Ortiz Martinez. See Depo Francisco Ortiz Martinez (Ortiz Martinez Depo; Johnson Decl at 4–5 ¶ 12, Exh K) at 9:2–10:15.

In September 2000, Martinez had another confrontation with Garbarino Sr. Mar-

tinez Depo at 14:9–12; see also Martinez Decl at 7 ¶ 28. When Martinez arrived at work that day, Garbarino Sr rudely demanded that Martinez perform recycling duties that were not a part of Martinez' job description. When Martinez objected, Garbarino Sr said, "What the fuck do I care? You do it because I tell you to" and "What the fuck do I care? I want you to do it." Martinez Depo at 15:20–16:3; see also Martinez Decl at 7–8 ¶ 28. Martinez refused and told Garbarino Sr that Garbarino Sr should not force a worker to perform duties that were not in his job description and that Martinez would contact the union. Martinez Depo at 16:4–9; see also Martinez Decl at 8 ¶ 28. Garbarino said, "Don't put the union into this." Martinez Depo at 16:10–11; see also Martinez Decl at 8 ¶ 29. Garbarino Sr also stated that he did not like "fucking Mexicans" and that he was "going to fire all of them." Martinez Depo at 21:13–15; see also Martinez Decl at 8 ¶ 29. This incident was also witnessed by Ortiz Martinez, who corroborates the racially-charged language Garbarino Sr used during the dispute. Ortiz Martinez Depo at 14:3–14. Martinez later complained both to the union and to MSS' operations manager, David Garbarino (Garbarino Jr). Martinez Depo at 17:5–20:5; see also Martinez Decl at 8 ¶ 30, 31.

Both Martinez' declaration and deposition testimony describes the culmination of the racially charged incidents between Martinez and Garbarino Sr. This allegedly occurred the day after or several days after the recycling incident. Garbarino Sr pulled Martinez aside to speak with him privately in Garbarino Sr's office. Martinez Depo at 23:24–24:4; see also Martinez Decl at 8–9 ¶ 32. Martinez and Garbarino Sr discussed and argued briefly about Garbarino Sr's treatment of Latinos, and Martinez got up to leave. Martinez Depo at 24:8–25:3; see also Martinez Decl at 9 ¶ 32–33. Garbarino Sr stood to block Martinez' way, stated that "this should not stay like this between us" and asked for Martinez' forgiveness. Martinez Depo at 25:4–7; see also Martinez Decl at 9 ¶ 33. Not finding Garbarino Sr to be sincere, Martinez declined to forgive him and told Garbarino Sr to give him more time. Martinez Depo at 25:8–11; see also Martinez Decl at 9 ¶ 33. Garbarino Sr then demanded that Martinez shake his hand. Martinez Depo at 25:12. When Martinez refused, Garbarino Sr said, "Come on, god damn it!" Martinez Depo at 25:14; see also Martinez Decl at 9 ¶ 34. When Martinez again refused, Garbarino picked up Martinez' hand, grabbed Martinez' arm and pulled him close. Red-faced and shaking, Garbarino Sr then said, "Fucking Mexican, I am going to kill you." Martinez Depo at 25:15–18; see also Martinez Decl at 9 ¶ 34. At that point, Martinez left. Garbarino Sr followed him out, laughing, and said, "They call me Pepito, what do you want me to call you?" Martinez replied that his name was "Francisco." Martinez Depo at 25:20–25; see also Martinez Decl at 9 ¶ 35. No one else was present during this incident. Martinez Depo at 26:8–14.

According to both his deposition and his declaration, Martinez went to the hospital and was provided with medication to treat anxiety several weeks after the incident. Martinez Depo at 30:18–32:5; see also Martinez Decl at 10 ¶ 36. After being released from the hospital, Martinez reported the confrontation with Garbarino Sr to the union. Martinez Depo at 32:9–11; see also Martinez Decl at 10 ¶ 36. Following his reporting of the incident, Martinez took three weeks vacation from work. Martinez Depo at 35:18–25; see also Martinez Decl at 11 ¶ 39. Martinez then began seeing a psychiatrist, who believes that Martinez suffers from an anxiety dis-

order as a result of his fractious relationship with Garbarino Sr. Martinez Depo at 40:5–23; see also Martinez Decl at 10 ¶ 38; Decl Frank Lossy (Lossy Decl; Johnson Decl at 3 ¶ 6, Exh E) at 13:15–19.

### Martinez' Deposition: After the Fall 2000 Events

Martinez' deposition and declaration also differ in significant respects regarding the denouement of the confrontation in Garbarino Sr's office. In his deposition, Martinez testified that, subsequent to the final confrontation, Martinez has had little contact with Garbarino Sr. Martinez Depo at 29:19–25. Martinez has had very limited communication with Garbarino Sr and has only spoken to him about work-related issues. *Id.* at 79:17–18. Since the office incident, Martinez has not heard Garbarino Sr make any other comments that Martinez considers offensive. *Id.* at 29:3–11. Martinez is also unaware of any other manager or supervisor at MSS who has used the derogatory remarks "fucking Mexican" or "Mexican pig." *Id.* at 78:7–13.

Since the office incident, Martinez identifies only one other employee, Isidro Montano, who has told Martinez anything regarding Garbarino's use of racial slurs. Montano told Martinez that he had spoken with Garbarino Sr about Garbarino Sr's use of the term "fucking Mexican" and had informed Garbarino Sr that Garbarino Sr was "not learning" any lessons from Martinez' lawsuit. *Id.* at 41:6–42:21. It is unclear from Martinez' deposition whether Montano told Martinez that Montano had actually overheard Garbarino Sr use such a racial epithet, or whether Montano merely told Garbarino Sr that Garbarino Sr was "not learning" from Martinez' decision to file a lawsuit. See *id.* No one else has told Martinez that they have heard Garbarino Sr use the term "fucking Mexican." *Id.* at 42:22–25.

Additionally, Martinez testified in his deposition that Garbarino Sr has made no other statements to Martinez that Martinez understood to mean that Garbarino Sr might threaten him physically. *Id.* at 72:1–5. Martinez is unaware of any other employee who might have been threatened with physical harm by Garbarino Sr. *Id.* at 72:6–9. Martinez has never heard that Garbarino Sr has had anyone killed. *Id.* at 74:4–6.

### Martinez' Declaration: After the Fall 2000 Events

In his declaration, however, Martinez makes some claims that are inconsistent with his deposition testimony. Martinez reported in his deposition that he had not heard Garbarino Sr use any more racial epithets and that he was aware of no other managers or supervisors who used terms like "fucking Mexican" or "Mexican pig." See Martinez Depo at 29:3–11, 78:7–13. Yet in his declaration, Martinez claims that in September 2000 another employee at MSS, Alice Garcia, told him she was leaving the company and that she had heard Garbarino Sr use the term "fucking Mexican." Martinez Decl at 3 ¶ 13. This incident was not reported in his deposition.

And despite his testimony regarding lack of further physical threats, Martinez asserts in his declaration that he heard from several other employees that Garbarino Sr was displeased that Martinez had taken legal action, that Garbarino Sr was going to run Martinez over in his truck and that Garbarino Sr was going to fire Martinez. Martinez Decl at 11 ¶¶ 42–44. According to Martinez' declaration, Garbarino Sr has also told Martinez that Martinez "might as well run [Garbarino Sr] over" in a garbage truck and has tried to convince Martinez to fire his attorney. *Id.*

at 11–12 ¶ 45. It is unclear from Martinez' declaration when all of these alleged events occurred, though at least some of them appear to have occurred shortly after the office incident. Martinez states that one such incident, in which an employee told him that Garbarino Sr was upset and was going to drive over Martinez in his truck, occurred "[o]ne morning after the [office] incident." Id. at 11 ¶ 42. Martinez also describes one event, in which an employee informed Martinez that Garbarino Sr was "after" Martinez and wanted to "get rid" of Martinez, as occurring in 2002. Id. at 11 ¶ 44. Martinez does not specify, however, whether this event occurred before or after Martinez' February 2002 deposition.

Finally, in his declaration, Martinez states that he took a stress-related medical leave from work in early 2001. Martinez Decl at 11 ¶ 39. The court has not found any testimony in Martinez' deposition relating to this medical leave.

### B

In September of 2001, Martinez filed this action against MSS and Garbarino in federal district court, alleging five separate causes of action: (1) fostering a hostile work environment and failing to promote or reassign on account of race in violation of 42 USC § 1981; (2) fostering a hostile work environment in violation of the California Fair Employment and Housing Act (FEHA), Cal Gov Code § 12940; (3) assault; (4) battery; (5) intentional infliction of emotional distress. See generally Pl Compl (Doc # 1). Martinez premised federal jurisdiction on his allegations of a violation of 42 USC § 1981. Id. at 1 ¶ 1.

This case was eventually referred to a magistrate judge for a settlement conference (Doc # 10), but the parties did not settle (Doc # 18). Subsequently, on July 1, 2003, the parties held a pretrial confer-

ence before the court (Doc # 24). At the pretrial conference, Martinez' counsel advised the court that he would not pursue the § 1981 claims any further. Mot Decl Supp Juris (Doc # 26) at 3:6–7; Opp Mot Decl Supp Juris (Doc # 28) at 8:19–20. The joint pretrial conference statement, as well as the court's civil minute order, reflect this fact. Joint Pretr Conf St (Doc # 23) at 19:26 ("Plaintiff has agreed to dismiss claims of discrimination."); Pretr Conf Min Ent (Doc # 24) (noting four state law claims only, and no § 1981 claims).

On August 22, 2003, defendants filed a motion to decline supplemental jurisdiction over the remaining state claims and to dismiss the case (Doc # 26). After Martinez failed to respond in a timely fashion, the court issued a September 11, 2003, order to show cause why defendants' motion should not be treated as unopposed (Doc # 29). Although untimely, Martinez filed his opposition to the motion on September 10, 2003 (Doc # 28). Defendants filed a reply memorandum on September 11, 2003 (Doc # 30). On October 17, 2003, the court denied defendants' motion to decline supplemental jurisdiction, reasoning that Martinez could continue to pursue his § 1981 claims if he paid defendants' fees and costs for bringing the motion to decline supplemental jurisdiction. Doc # 33.

The parties resolved the matter of Martinez' payment of fees and costs (Doc # 36), and Martinez continued to pursue his § 1981 claims. At the pretrial conference on November 29, 2003, the court fixed a dispositive motions hearing date of February 5, 2004, and a jury trial date of February 23, 2004. Doc # 39. Subsequently, on December 31, 2003, defendants filed the instant motion for summary adjudication of Martinez' § 1981 and FEHA claims and to decline supplemental jurisdiction over the remaining state claims.

Doc # 42. Martinez filed his opposition on January 15, 2004. Doc # 43. Defendants filed their reply brief on January 22, 2004. Doc # 48. In that reply brief, defendants object to Martinez' January 2004 declaration (Doc # 46) on the grounds that it is a sham affidavit and indicate that they intend to file evidentiary objections to the other supporting documentation Martinez filed in support of his opposition. Reply Mot Sum Judg (Doc # 48) at 2:9–4:15. Such evidentiary objections were filed on January 23, 2004. Doc # 49. The court conducted a hearing on the motion on February 5, 2004. Doc # 73.

Before the court, therefore, are three issues: (1) whether to exclude the evidence to which defendants object, including whether to exclude Martinez' declaration as a sham affidavit; (2) whether defendants are entitled to summary adjudication of Martinez' § 1981 and FEHA claims; and (3) if defendants are entitled to summary adjudication of the § 1981 claim, whether the court should decline supplemental adjudication over the remaining state law claims. The court addresses each matter in turn.

II

The court first addresses the matter of Martinez' January 2004 declaration and defendants' other anticipated evidentiary objections to the evidence proffered by Martinez.

A

The court first considers defendants' objections to Martinez' January 2004 declaration. Defendants point out that Martinez' declaration is submitted in English without a Spanish translation or other proof that Martinez read and understood the declaration. Reply Mot Sum Judg at 2:12 n. 1. In contrast, Martinez' deposition testimony, taken approximately two years ago,

was conducted under oath and with the aid of a Spanish-speaking interpreter. *Id.* at 2:11–12; Martinez Depo at 5:9–24. Defendants contend that the Martinez declaration contradicts Martinez' deposition testimony in a material fashion, because he testified in his deposition that his problems with Garbarino Sr began in 2000 and failed to testify regarding any other alleged racial slurs or other discriminatory behavior. Defendants also object to most of the allegations contained in the declaration, in large part on the grounds that such allegations are without foundation. Def Ev Obj at 1:10–4:28. Defendants also contend that many of the allegations contain inadmissible hearsay and assume facts not in evidence. *Id.*

 Under the "sham affidavit" rule, a party cannot create a genuine issue of material fact for summary judgment purposes by submitting an affidavit or declaration that contradicts his previous testimony without sufficient explanation for the contradiction. *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975); see *Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (recognizing that this rule applies in all circuits). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266 (9th Cir.1991) (citation and internal quotation omitted). In making the decision whether such an affidavit or declaration is in fact a sham, the court must consider whether the party submitting the affidavit or declaration provides a sufficient explanation for the contradiction. *Persistence*

*Software, Inc. v. The Object People, Inc.,* 128 F Supp 2d 623, 629 (N.D.Cal.2000).

Martinez presents no explanation for the contradictions between his deposition testimony and his declaration. Martinez was given ample opportunity at his deposition to raise the issue of any alleged discriminatory remarks made to him; yet Martinez failed to discuss any such incidents prior to the year 2000. Further, the declaration presents no explanation why Martinez did not raise such incidents in his deposition or why he testified in his deposition that his problems with Garbarino Sr began in 2000. Any such occurrences of discriminatory behavior are subjects that would have been within Martinez' personal knowledge at the time of the deposition, and Martinez (and his attorney) had every reason to bring forth such occurrences at Martinez' deposition in response to the questions asked. Thus, there is no ground to conclude that Martinez' contradictory allegations regarding the events before fall 2000 are based on newly discovered evidence.

The same is true for many of the contradictory allegations regarding events taking place after the three incidents in fall 2000. Martinez had no reason at the deposition not to report the incident involving Alice Garcia, since that event occurred long before his February 2002 deposition. Similarly, Martinez likely could have reported at least some of the information concerning threats Garbarino Sr allegedly made toward Martinez, since Martinez declares that some of these threats were made "[o]ne morning after the [office] incident." See Martinez Decl at 11 ¶ 42. Because Martinez' declaration does not include specific dates on which these alleged threats occurred, it is possible that some of the threats had not yet happened at the time of the deposition. But given the lack of specificity regarding the dates of such alleged threats, and given that the declaration is rife with other inconsistencies, there is scant reason to give Martinez the benefit of the doubt that these allegations are based on newly acquired evidence.

The contradictions regarding Martinez' allegedly discriminatory treatment are significant, but they are not the only problem with the declaration. FRCP 56(e) requires that declarations and affidavits be made on personal knowledge, shall set forth facts that would constitute admissible evidence and shall affirmatively show that the declarant or affiant is competent to testify regarding such facts. As an initial matter, Martinez' declaration fails to show that the declaration was made with the aid of a Spanish interpreter, as was his deposition. More importantly, many of the allegations made in the declaration are based on hearsay and are not within Martinez' personal knowledge. These are strong reasons not to consider the assertions of the declaration as evidence in connection with the summary judgment motion. See *Block v. City of Los Angeles,* 253 F.3d 410, 419 (9th Cir.2001). A further problem with considering the information in the declaration is that Martinez' new allegations regarding discrimination are vague and do not provide concrete examples of discrimination, as did his deposition testimony. "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Himaka v. Buddhist Churches of America,* 917 F.Supp. 698, 704 (N.D.Cal.1995) (citing *Falls Riverway Realty, Inc. v. Niagara Falls,* 754 F.2d 49, 57 (2nd Cir.1985), and *Thornhill Pub. Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979)). To consider the inconsistent allegations of the declaration, prepared almost two years after Martinez' deposition, is simply at odds with full and fair discovery under the Federal

Rules. These rules are designed to foster the early production of relevant facts and prevent hiding crucial information until the eve of trial.

Accordingly, the court finds that Martinez should not be allowed to create a material issue of fact at this stage of the proceeding by submitting a declaration that significantly contradicts his previous deposition testimony and that it is appropriate to exclude Martinez' declaration under the sham affidavit rule.

## B

Having excluded Martinez' January 2004 declaration under the sham affidavit rule, the court need not rule on the specific evidentiary objections to that document. So the court now turns to defendants' objections to plaintiffs' remaining evidence.

### Ortiz Martinez

■ The court begins with defendants' objections to the use of Ortiz Martinez' deposition testimony. See Johnson Decl at 4–5 ¶ 12, Exh K. Defendants object that Ortiz Martinez' testimony is not relevant and lacks foundation. Much of the testimony to which defendants object is in regard to the racially-charged incidents about which Martinez himself testified in his own deposition. Based on Martinez' deposition, the court has assumed the truth of such incidents for purposes of this motion. The court cannot say that Ortiz Martinez' testimony is not relevant, as it tends to corroborate the incidents about which Martinez himself testifies. But because the court need not and has not relied on that testimony in connection with the instant motion, it is not necessary to rule on the objections to this cumulative evidence. The only other purpose for which the Ortiz Martinez declaration is crucial is to establish that Ortiz Martinez witnessed the events. Thus, to the extend that defendants object to Ortiz Martinez' deposition in this regard, those objections are overruled.

### Sheldon

Defendants next object to the portions of the deposition of Charles Sheldon (Sheldon). See Johnson Decl at 3 ¶ 9, Exh H. Defendants object that Sheldon's testimony is not relevant, lacks foundation, assumes facts not in evidence and is based in part on hearsay. Sheldon testified in his deposition that he "believe[s] [he] ha[s] heard" the terms "lazy Mexican," "fucking Mexican" or "porko Mexicano" used at the MSS workplace. Sheldon Decl at 28:7–10. Sheldon stated that he had heard these terms "[p]robably in conversations with other fellow employees" and that he had a specific recollection that no management personnel were present. *Id.* at 28:11–24. Sheldon did not recall, however, who made the statements, to which employees the statements referred or when the statements were made. *Id.* at 28:25–30:2.

The court does not agree with defendants that Sheldon's testimony is based on inadmissible hearsay or that it is completely irrelevant to the issue of hostile work environment. Sheldon testifies that he heard racial epithets used at the MSS workplace. Sheldon's testimony regarding the epithets is not used to prove the "truth" of such epithets but rather to prove that such statements had, in fact, been made. Further, those statements may be relevant to whether Martinez experienced a hostile work environment. Of course, the fact that the testimony is vague, lacking in foundation and concerns events not witnessed by Martinez may affect the degree to which the court may consider such testimony in determining whether Martinez has an actionable hostile work environment claim. But this does

not mean the testimony is completely irrelevant—at least at this stage of analysis.

Sheldon also testifies that he specifically remembers that no management personnel were present during the times when he heard an MSS employee use a racial epithet. Such testimony is relevant to the issue of the severity or pervasiveness of the alleged racial animus in the workplace and actually tends to support defendants' position. The court thus overrules defendants' objections to Sheldon's deposition testimony.

### Camacho

Defendants also object to the deposition testimony of Raul Camacho (Camacho). Johnson Decl 5 ¶ 13, Exh L. Defendants object to much of Camacho's deposition testimony as being irrelevant and lacking in foundation. Most of Camacho's testimony does not involve any events in which Martinez was involved and thus is of little relevance to the present action. Several portions of Camacho's testimony, however, are notable. First, Camacho testifies that, in the context of Camacho attempting to take vacation time from work, Garbarino Sr told him to go back to Mexico and not come back. Camancho Depo at 29:12–25. On another occasion, when Camancho called in sick to work, Garbarino Sr again told him to "go back to Mexico." *Id.* at 30:2–11. Second, Camacho testified that he never heard Garbarino Sr use the terms "fucking Mexican" or "puerco Mexicano." As with Sheldon's testimony regarding racial epithets, such testimony may be probative whether the working environment at MSS was sufficiently hostile to support a § 1981 claim. The weight given to Camacho's testimony regarding Garbarino Sr's comments, however, may be affected by the fact that Martinez did not witness the events and does not testify that he was aware of the events.

One final portion of Camacho's deposition that should be noted is his testimony that Martinez and Ortiz Martinez told him that Garbarino Sr had used the term "lazy Mexican." *Id.* at 34:5–35:19. Of course, the Martinez and Ortiz Martinez statements regarding statements by Garbarino Sr is inadmissible hearsay and should be excluded on that ground.

### Chafoya

Defendants' next objections are to the deposition of Oscar Chafoya (Chafoya). Johnson Decl at 4 ¶ 11, Exh J. The Chafoya deposition, in large part, does not relate to any incidents involving Martinez or racial epithets and thus is not relevant to the present dispute. Two portions of the testimony are of note. First, Chafoya testifies that another individual, Jose Ochoa, told him that Garbarino had called Ochoa a "fucking Mexican." Chafoya Depo at 27:10–28:3. Such testimony is of little value, considering that Martinez does not testify that he was aware of the statements. Chafoya's testimony concerning Ochoa's statements constitutes hearsay and, because there is no showing the statement was relayed to Martinez, should be excluded on that ground.

Chafoya, however, offers some additional testimony regarding the recycling incident. Chafoya Depo at 34:2–23. The court has accepted as true Martinez' deposition testimony in support of that incident. The Chafoya deposition is thus cumulative with respect to whether Martinez has a triable issue of fact. Because the court need not and has not relied on the Chafoya deposition in connection with this motion, the court need not rule on any objections to that portion of the testimony.

### Alvarez

Defendants also object to the deposition testimony of Andres Alvarez (Alvarez).

Johnson Decl at 2 ¶ 3, Exh B. The Alvarez deposition largely describes events that do not involve Martinez and thus is of marginal relevance. But as with the other depositions, several portions of Alvarez' testimony are notable. First, Alvarez testifies that, although he has not heard Garbarino Sr use racial epithets in front of other employees, he has heard him use the term "fucking Mexican" behind other employees' backs. Alvarez Depo at 36:1–37:21. In fact, Alvarez states that Garbarino Sr referred to Martinez as a "fucking Mexican" to Alvarez. *Id.* at 52:17–53:7. Alvarez also testifies that he heard Garbarino Sr call Montano by the name "porko Mexicano," though such name-calling was only done "as a joke." *Id.* at 42:19–43:19. Such testimony may be of some relevance to the hostile work environment claim. The weight of such testimony, however, is diminished by the fact that Martinez did not witness the incidents described therein. Nor does Martinez show that Alvarez' renditions of Garbarino Sr's comments were relayed to Martinez.

Alvarez also testifies that several employees informed him that they had heard Garbarino use racial epithets. Both Martinez and Ochoa came to Alvarez and told him that Garbarino Sr had called them "fucking Mexicans." *Id.* at 38:2–9. Alvarez also testified that Ochoa and Chafoya had come to him and told him that Garbarino Sr had called them "lazy Mexicans." *Id.* at 44:21–45:23. All of this testimony is inadmissible hearsay and cannot be used in determining the sufficiency of Martinez' claims.

*Miranda*

Defendants' final objections are to the deposition of Rafael Miranda (Miranda). Johnson Decl at 2–3 ¶ 5, Exh D. The Miranda deposition, again, largely describes events that did not involve Martinez and thus is of little relevance to the case at bar. Several portions of the Miranda deposition are nonetheless potentially useful. First, Miranda testifies about an incident reported by an unidentified Latino employee, whom Miranda believes may have been a familial relation of Martinez'. The unidentified employee allegedly had an altercation with Garbarino Sr in which the employee asked for leave to go to a funeral and Garbarino Sr called him a "fucking Mexican." Miranda Depo at 27:20–29:17. This testimony is inadmissible hearsay and cannot be used to support Martinez' hostile work environment claim.

Miranda also testified that Martinez reported to him that Garbarino Sr had called him a "fucking Mexican" in the context of an employment dispute. *Id.* at 34:10–16. Such testimony is perhaps relevant to Martinez' state of mind, if Martinez can show the predicate fact of Garbarino Sr having made the statement. The court therefore overrules the objection to this testimony.

### III

Having parsed the evidence, the court turns to the motion for summary judgment itself.

### A

In reviewing a summary judgment motion, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude

the entry of summary judgment." *Id.* And the burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is granted only if the moving party is entitled to judgment as a matter of law. FRCP 56(c).

The nonmoving party may not simply rely on the pleadings, however, but must produce significant probative evidence supporting its claim that a genuine issue of material fact exists. *TW Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). The evidence presented by the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id at 249, 106 S.Ct. 2505.

## B

Defendants essentially break Martinez' § 1981 claim into two parts: a hostile work environment claim and a failure to promote claim. Defendants contend that summary adjudication of both types of § 1981 claim is appropriate. As defendants point out in their reply brief, it is unclear whether Martinez' § 1981 claim is premised on *both* hostile work environment and failure to promote theories, or *only* a failure to promote theory. See Reply Mot Sum Judg at 8:17–19, 9:5–22. Martinez' complaint only states *one* § 1981 claim, but his allegations under that claim appear to assert both theories of liability. See Compl at 3–5 ¶¶ 9–20. Despite such problematic pleading, the court will consider both theories of liability under § 1981. In addition to the § 1981 claim, defendants also move for summary judgment on Martinez' FEHA claim.

### 1

The court begins with Martinez' apparent hostile work environment claim under § 1981. The court must evaluate two issues in considering the vitality of this claim: (1) which of the incidents on which Martinez presents proof may be considered in analyzing whether Martinez' hostile work environment claim is legally sufficient; and (2) based on those incidents that the court properly may consider, whether Martinez' version of the facts is sufficient to support a hostile work environment claim under § 1981.

### a

The court must first evaluate which of the events alleged by Martinez or other witnesses properly be taken into the court's calculus in analyzing the hostile work environment claim. First, as the court has herein determined that Martinez' declaration should be excluded, none of the evidence presented in that declaration should be considered, and the court thus does not consider any of the alleged events supported only by Martinez' declaration testimony.

Second, the court must determine which (if any) of the incidents described by other witnesses may be used in evaluating the sufficiency of Martinez' hostile work environment claim. As an initial matter, it is worth noting that Martinez' counsel provides the court with very little guidance on the appropriate use of this additional deposition testimony. Martinez' opposition brief is filled with sweeping generalizations supported by lengthy string citations to numerous excerpts from the various depositions. The opposition brief fails to list the specific incidents about which the other deponents testify; whether and how such citations to the record are relevant

(or even admissible) is left completely up to the court's own research and determination. As the Ninth Circuit has noted, "it is not our task * * * to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996) (internal quotation and citation omitted). Nevertheless, the court has spent considerable time "scouring the record" to determine whether any of the testimony presented in the attached portions of the depositions is of use in supporting Martinez' hostile work environment claim. As explained below, the court has determined that, in large part, that testimony is not useful in this regard.

■ At the outset, the court notes that much of the deposition testimony constitutes inadmissible hearsay. Incidents of harassment predicated on inadmissible hearsay are not proper for the court to consider in evaluating the hostility of Martinez' workplace. See *Leibovitz v. New York City Transit Authority*, 252 F.3d 179, 189 (2d Cir.2001). In the previous section of this order dealing with evidentiary objections, the court has already excluded such hearsay statements from its evaluation. This includes Camacho's testimony regarding Martinez and Ortiz Martinez' statements, Chafoya's testimony regarding Ochoa's statements, Alvarez' testimony regarding Martinez, Ochoa and Chafoya's statements and Miranda's testimony regarding the unidentified Latino employee.

Additionally, to establish a hostile work environment, Martinez cannot rely on incidents of which he had no personal knowledge. Although potentially relevant to the workplace as experienced by all the employees as a whole, harassment of which Martinez had no knowledge has no bearing on whether Martinez himself reasonably considered the workplace hostile. *Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir.2000). Of the incidents not already excluded on hearsay grounds, this limitation also excludes Sheldon's testimony regarding racial epithets, Camacho's testimony regarding Garbarino Sr's "go back to Mexico" comments and Alvarez' testimony regarding the racial epithets he overheard—even including the one made in reference to Martinez himself. Martinez fails to present evidence that he was aware of any of these incidents.

The court, therefore, may not consider the bulk of the testimony contained in the depositions of the other witnesses, save as such testimony corroborates Martinez' own deposition testimony. Based on Martinez' deposition, he heard Garbarino Sr use racial epithets beginning in 2000 when Martinez reminded Garbarino that he was also of Mexican heritage and culminating with the botched apology attempt in Garbarino's office in September 2000. As Martinez witnessed this series of events, such events are all proper to consider when evaluating his hostile work environment claim.

■ Martinez also testified in his deposition that his brother Leonardo told him that he had heard Garbarino Sr use the term "fucking Mexican." Martinez Depo at 61:8–24. Martinez also testified that Montano had recounted to him a conversation in which Montano had told Garbarino Sr that Garbarino Sr had "not learned" anything from Martinez' lawsuit. Martinez Depo at 41:6–42:21. Both such events constitute hearsay and, at least with respect to proving the truth of the matter asserted, must also be excluded. So in order to consider these statements, the court must determine whether they might be admitted for some other purpose. In this regard, the court notes that some courts have concluded that a plaintiff may

not rely *at all* on statements made to others to defeat a summary judgment claim. See *Keenan v. Allan*, 889 F.Supp. 1320, 1375 n. 68 (E.D.Wash.1995). Many courts, however, allow incidents involving other employees to be considered when evaluating the objective hostility of plaintiff's workplace. See *Leibovitz*, 252 F.3d at 190. When such incidents are premised on hearsay, however, proof of those incidents may be admitted for its effect on the plaintiff's *subjective state of mind—not* for proof that the incidents actually occurred. *Id.* at 190 n. 8. Thus, the court may consider these two hearsay statements to the extent that they affected Martinez' *subjective perceptions* of his work environment—but not as evidence that the racially charged comments actually occurred. Accordingly, these two alleged events are of limited value in the court's assessment of Martinez' working environment, as the dispute regarding the hostile work environment claim involves its *objective* sufficiency, as is detailed below.

 The court must also consider whether the relevant statute of limitations bars consideration of any of the alleged events. California's one-year statute of limitations for personal injury actions governs civil rights actions brought pursuant to §§ 1981, 1983 and 1985. *Taylor v. Regents of University of California*, 993 F.2d 710, 711 (9th Cir.1993), cert. denied, 510 U.S. 1076, 114 S.Ct. 890, 127 L.Ed.2d 83 (1994). Although California has increased the personal injury statutory period from one year to two years, effective January 1, 2003, the old one-year statute applies to cases filed before January 1, 2003. *Abreu v. Ramirez*, 284 F.Supp.2d 1250, 1256 (C.D.Cal.2003). Thus, the only events that are actionable in a § 1981 hostile work environment claim are those that fall within the one-year period preceding the filing of the complaint.

Previously, the continuing violation doctrine provided an exception to the statute of limitations. This doctrine permitted plaintiff to complain about an act of discrimination that would otherwise be time-barred if that act is part of a continuing series of events, the last of which occurred within the statutory period. See e.g., *Sisseton–Wahpeton Sioux Tribe v. United States*, 895 F.2d 588, 597 (9th Cir 1990). But the Supreme Court has since held that, in the Title VII context, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Time-barred acts are relevant only to the extent that they can be used "as background evidence in support of a timely claim." *Id.* The Ninth Circuit has interpreted *Morgan* to apply to civil rights claims brought under §§ 1983 and 1985 and to "overrule[ ] previous Ninth Circuit authority holding that, if a discriminatory act took place within the limitations period and that act was related and similar to acts that took place outside the limitations period, all the related acts—including the earlier acts—were actionable as part of a continuing violation." *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1061 (9th Cir.2002). Given the Ninth Circuit's application of *Morgan* to other civil rights statutes, it might be the case that the doctrine of continuing acts is no longer a valid method for making a time-barred act or acts actionable under § 1981.

The holding of *Morgan*, however, is not so broad as to apply to hostile work environment claims. In fact, the Supreme Court explicitly exempted hostile work environment claims from its invalidation of the doctrine of continuing acts. "The[ ] very nature [of hostile work environment

claims] involves repeated conduct[,and] * * * [t]he unlawful employment practice therefore cannot be said to occur on any particular day." *Morgan,* 536 U.S. at 115, 122 S.Ct. 2061 (internal citations and quotations omitted). Because "a hostile work environment claim is comprised of a series of separate acts that collectively constitute one unlawful employment practice[,][t]he timely filing provision only requires that a [hostile work environment] plaintiff file a charge within a certain number of days after the unlawful practice happened." *Id.* at 117, 122 S.Ct. 2061. The Ninth Circuit has interpreted this standard to mean that "claims based on a hostile work environment are only timely where at least one act occurred during the limitations period." *Cherosky v. Henderson,* 330 F.3d 1243, 1246 (9th Cir.2003).

Here, Martinez filed his complaint in this action on September 7, 2001. Thus, the court may take into account events that occurred before September 7, 2000, if Martinez alleges at least one discriminatory event occurring within the statutory time period.

Some of the events, such as the incident in which Martinez disposed of items that were not garbage, clearly do not provide a basis for making the claim actionable. It is somewhat unclear when, exactly, the other two major incidents involving confrontations between Martinez and Garbarino Sr occurred. According to Martinez, the recycling incident occurred on September 5, 2000. Although the dates are close, Martinez' own papers thus seem to place that event outside the permissible time period. See Opp Mot Sum Judg at 4:19–20. Martinez also maintains that the confrontation in Garbarino Sr's office occurred two days after the recycling incident, which would be September 7, 2000. See *id.* at 5:11, 5:19. This would mean that such incident occurred just within the stat-

utory period. Defendants also state in their moving papers that the confrontation in Garbarino's office took place several days after the recycling incident, which would put the event within the statutory period. Mot Sum Judg at 3:16. Despite the lack of certainty as to the exact date of the office confrontation, the court is willing to assume that the office incident occurred within the statutory time period.

Thus, the office incident having occurred on September 7, 2000, the court is free under *Morgan* both to find that the hostile work environment claim is actionable and to consider the incidents occurring outside the statutory period. This includes the incident in which Martinez threw away items that were not garbage and the recycling incident, as well as the incident in which Martinez reminded Garbarino Sr that he, Martinez, was also of Mexican heritage.

b

■ Having determined which of Martinez' allegations the court properly may consider in evaluating the sufficiency of Martinez' hostile work environment claim under § 1981, the court now turns to the proper standard for evaluating such a claim. Section 1981 provides that all persons within the Unites States enjoy the same rights as white citizens to "make and enforce contracts." 42 USC § 1981(a). The Supreme Court ruled in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) that a hostile work environment claim is not cognizable under § 1981. In response, Congress amended § 1981 to include within its definition of making and enforcing contracts "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Manatt v. Bank of America,* 339 F.3d 792, 797 (9th Cir.2003); 42 USC § 1981(b). The Ninth Circuit has subsequently interpreted § 1981 as

"evinc[ing] congressional intent to permit hostile work environment claims * * * [because a] hostile work environment claim interferes with the 'enjoyment of all benefits * * * and conditions of the contractual relationship' of employment * * *." *Id.* The court of appeals further found that "those legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action." *Id.* In evaluating Title VII claims, the Supreme Court has acknowledged the propriety of drawing on and "harmonizing" the standards for both racial and sexual harassment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 n. 1, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The court, therefore, may look to § 1981 or Title VII cases involving both racial and sexual harassment in evaluating whether the present claim should survive summary judgment.

To raise a prima facie case of racial harassment under Title VII or § 1981, Martinez must raise a triable issue of fact regarding whether: (1) he was subjected to verbal or physical conduct based on his race; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of Martinez' employment and to create an abusive work environment. *Manatt,* 339 F.3d at 798. Defendants' motion for summary judgment is based on their contention that Martinez cannot establish the third factor. While reserving their right to dispute that any of the allegedly abusive events occurred, defendants maintain that Martinez' allegations, even if true, do not rise to the level of "sufficiently severe or pervasive" racial harassment that would "alter the conditions of employment."

■ Section 1981, like Title VII, is not a "'general civility code.'" *Manatt,* 339 F.3d at 798, quoting *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275. To prove that the conditions of employment have been suffi- ciently altered by racial harassment, Martinez must show that his "'workplace [was] permeated with discriminatory intimidation'" such that his "'working environment [could] both subjectively and objectively be perceived as abusive.'" *Brooks,* 229 F.3d at 923, quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), and *Fuller v. City of Oakland,* 47 F.3d 1522, 1527 (9th Cir.1995). In evaluating the objective portion of the inquiry, the court should utilize a "totality of the circumstances" test, which includes factors such as: (1) the frequency of the discriminatory conduct; (2) the severity of the discriminatory conduct; (3) whether the conduct is physically threatening and publicly humiliating or merely an offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. *Little v. Windermere Relocation, Inc.,* 301 F.3d 958, 966 (9th Cir.2002); *Brooks,* 229 F.3d at 923–24. The less severe or serious the nature of the harassing conduct, the more pervasive or frequent such conduct must be. *Ellison v. Brady,* 924 F.2d 872, 878 (9th Cir.1991). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious)" will rarely give rise to a reasonable perception that a term or condition of employment has been so altered as to include harassment. *Manatt,* 339 F.3d at 798; see *Brooks,* 229 F.3d at 924 (finding that "an isolated incident of harassment by a co-worker will rarely (if ever) give rise to a reasonable fear that [racial] harassment has become a permanent fixture of the employment relationship"); *Ellison,* 924 F.2d at 878 (quoting *King v. Board of Regents of University of Wisconsin System,* 898 F.2d 533, 537 (7th Cir.1990), for the proposition that "'although a single act can be enough * * * generally, repeated incidents create a stronger claim of hostile environment, with the strength of the

claim depending of the number of incidents and the intensity of each incident' "). In evaluating the factors relating to the objective prong of the inquiry, the court should adopt the perspective of the reasonable victim. *Brooks*, 229 F.3d at 924 (citing *Ellison*, 924 F.2d at 879).

In the case at bar, neither party disputes that Martinez *subjectively* feels that the conditions of his employment have been altered to include racial abuse as an effective term. Rather, defendants argue that Martinez fails to meet the objective standard concerning the severity and pervasiveness of the alleged abuse. Although it is a close question, the court agrees with Martinez that the incidents that occurred in 2000, if true, are more closely analogous to incidents the Ninth Circuit has found sufficient and thus rises to the level of an objectively abusive work environment.

First, the court considers the frequency of the alleged racial harassment. As the court has noted, a single isolated event or handful of events will rarely give rise to a hostile work environment claim. *Brooks*, 229 F.3d at 924; *Ellison*, 924 F.2d at 878; see *Manatt*, 339 F.3d at 798. Martinez presents evidence of several occasions involving Garbarino Sr's use of racial epithets or racially-charged intimidation. Only the events in August and September 2000 seem to have involved Garbarino Sr's direction of such racial animus toward Martinez himself. See *Manatt*, 339 F.3d at 798 (distinguishing between racial epithets overheard by plaintiff and racial epithets or humor actually directed at her). Subsequent to these events, Garbarino Sr and Martinez have had relatively little contact, and Martinez admits that Garbarino Sr has not used any racial epithets in his presence since that confrontation. The racially-charged incidents that Martinez experienced thus appear to have been limited to a handful of events occurring over a two-month time period. Providing evidence of only a few specific racially-charged incidents is usually insufficient to support a claim for an objectively unreasonable hostile work environment. See *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642–43 (9th Cir.2003) (finding that, although plaintiff claimed that he was continually harassed, he provided specific factual allegations regarding only a few discrete incidents, which were insufficient). Thus, because Martinez presents specific evidence regarding only a few incidents, the court finds that the frequency factor does not appear to favor Martinez.

The court next turns to the severity factor. Some courts have held that an isolated incident or group of incidents may serve as the basis for a hostile work environment claim if sufficiently severe. See, e g, *Vance v. Southern Bell Tel. & Tel. Co* 863 F.2d 1503, 1510–11 (11th Cir.1989) (finding that two incidents which a noose was hung at an African American employee's work station were sufficiently severe to establish a hostile work environment claim). To be sufficiently severe, the isolated incidents must be "unusually severe." For example, for a hostile work environment claim based on sexual harassment, forcible rape would constitute a sufficiently severe incident on which to base such a claim, but a brief groping of the victim's stomach and breasts would not. *Brooks*, 229 F.3d at 921, 926; see also *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (characterizing rape as "criminal conduct of the most serious nature"); *Little*, 301 F.3d at 967–68 (finding a single incident of rape by a business associate actionable).

As the court has previously noted, "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not amount to a change in the terms and conditions of employment. *Ma-*

*natt*, 339 F.3d at 798. In *Manatt*, the plaintiff's coworkers called her "China woman" several times and, on several occasions, ridiculed her appearance and speech on the basis of her race. *Id.* at 795–96. The Ninth Circuit found that such behavior, although troubling, generally fell into the category of "simple teasing" and "offhand comments" and was not actionable. *Id.* at 799. See also *Vasquez*, 307 F.3d at 893 (no hostile work environment when plaintiff's supervisor made racially offensive remarks to plaintiff on two occasions and yelled at him in front of others). In comparison with the severity of the incidents described in *Vance, Brooks, Meritor Savings* and *Little*, the casual utterance of several offensive racial slurs is not likely to be severe enough to constitute actionable hostile work environment harassment. If groping a woman's intimate body parts is insufficiently severe to make a single event actionable, then a handful of racial epithets also seems insufficiently severe. Compare *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864, 870, 872–73 (9th Cir.2001) (finding sexually harassing insults actionable when employee was subjected to relentless campaign of insults, name-calling, vulgarities and taunts by coworkers and supervisors at least once a week and sometimes several times a day); *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir.1994) (finding racial epithets actionable only if plaintiff has been subjected to "a steady barrage of opprobrious racial comment" (citation omitted)).

But the conduct alleged by Martinez is more than just "simple teasing" or "offhand comments." The racially offensive conduct that occurred was Garbarino Sr's occasional use of the terms like "fucking Mexican" and "Mexican fag." Although such language, standing alone, might be insufficient to create a hostile work environment, the terms are nevertheless despicable and highly offensive. And because the insults involve vulgar language and seem to have been made in anger, the court does not believe it is entirely proper to characterize them as "simple teasing."

█ An additional fact that makes Garbarino Sr's alleged conduct more severe than it otherwise would be is that Garbarino Sr held a supervisory position. When the harassment comes from a supervisor, rather than a coworker, the conduct may be considered more severe. See *Brooks*, 229 F.3d at 927 n. 9 (noting that "a sexual assault by a supervisor, even on a single occasion, may well be sufficiently severe so as to alter the conditions of employment and give rise to a hostile work environment claim"). It is true that the Ninth Circuit has found on several recent occasions that racially offensive language was not actionable, despite the fact that the plaintiff's supervisor uttered some of the racial insults. See *Manatt*, 339 F.3d at 795, 799; *Vasquez*, 349 F.3d at 642–42. The fact that Garbarino Sr is Martinez' supervisor nevertheless makes Garbarino Sr's alleged use of racial epithets more significant than the use of similar epithets by other employees.

But the most significant fact with respect to severity is that at least one of Garbarino Sr's alleged usages of racial epithets occurred in conjunction with a threat to kill Martinez. In *Vance*, the court considered the racial harassment to be particularly severe because, given the historical significance of lynching African Americans in this country, the nooses conveyed a violent message more disturbing or threatening than any mere use of racial epithets would be. The racially-charged threat that Garbarino Sr made, if true, is similar to a noose. By allegedly threatening Martinez' life in conjunction with insulting his race, Garbarino Sr conveyed a violent mes-

sage to Martinez that is quite different from the merely offensive message conveyed by racially insensitive jokes or racial insults, such as those in *Manatt*. Even were Garbarino Sr merely joking with Martinez, such a determination is a factual dispute more appropriately resolved by the jury than by the court. The severity factor therefore counsels that the alleged racial harassment rises to the level necessary objectively to alter the terms of Martinez' employment.

The third factor to consider is whether the behavior is physically threatening or publicly humiliating. Here, during the office incident, Garbarino Sr allegedly forced Martinez to shake his hand and grabbed Martinez' arm. The physical threat posed by Garbarino Sr was relatively minor in comparison with the physically threatening behavior described in other cases, which included being raped or being struck with a ruler or kicked. See *Kang v. U Lim America, Inc.*, 296 F.3d 810, 814 (9th Cir. 2002) (describing plaintiff's physical abuse as consisting of being struck in the head with a metal ruler on 20 different occasions, being kicked in the shins, having his ears pulled, having metal ashtrays, calculators, water bottles, and files thrown at him and being forced to do jumping jacks); *Brooks*, 229 F.3d at 921, 926 (contrasting fondling with forcible rape). And according to his testimony, Martinez apparently had no trouble extricating himself from the physically intimidating situation after it occurred, as Martinez left Garbarino Sr's office immediately after being forced to shake Garbarino Sr's hand. Nevertheless, Garbarino's behavior was somewhat physically threatening in nature, since Garbarino Sr allegedly grabbed Martinez' arm and since Martinez did not want to shake Garbarino Sr's hand.

Additionally, Garbarino Sr alleged insults were overheard by another MSS employee on two occasions—Ortiz Martinez testifies that he overheard the insults made in connection with Martinez' disposal of items that were not garbage and in connection with the recycling incident. That Ortiz Martinez witnessed these incidents may heighten their significance to some extent. See *Smith v. Northwest Financial Acceptance, Inc.*, 129 F.3d 1408, 1414 (10th Cir.1997) (finding that the incident in question was exacerbated by its public setting). Not all the incidents appear to have been publicly embarrassing for Martinez, as the most severe event took place in Garbarino Sr's office and Martinez testified that no other people were present or overheard that confrontation. See Martinez Depo 26:8–14. Thus, the fact that Ortiz Martinez witnessed the two other incidents probably is not enough on its own to make Martinez' claim actionable. See *Manatt*, 339 F.3d at 795–796, 799 (describing an incident in which plaintiff was taunted in front of other employees because of her allegedly race-related mispronunciation of a word and later finding plaintiff's claim insufficient). Nevertheless, given the combination of the physical intimidation Martinez allegedly experienced in Garbarino Sr's office and Ortiz Martinez' observation of the other two incidents, the court finds that the third factor favors a finding of hostile work environment.

The final factor for the court to consider is whether the behavior unreasonably interfered with Martinez' work performance. It is clear that the behavior in question interfered with Martinez' work performance to an extent, since Martinez became fearful, developed an anxiety disorder and began visiting a psychiatrist. But the question is not whether the behavior simply interfered with Martinez' work performance, but rather whether the behavior *unreasonably* interfered with Martinez' work performance. The facts that Mar-

tinez became fearful and began seeing a psychiatrist alone are not dispositive. See *Brooks,* 229 F.3d at 922 (noting that plaintiff, whose claim was dismissed, had taken six months' leave of absence and had begun seeing a psychologist). Martinez presents evidence that Garbarino Sr insulted him on the basis of his race and then threatened to fire him. Martinez also presents evidence that Martinez threatened to kill him during their final confrontation in Garbarino Sr's office. Threats to fire and to kill would undoubtedly interfere with a reasonable employee's ability (and motivation) to do his job well. Martinez does not, however, present any evidence that Garbarino Sr's threat to his life was anything more than the kind of hyperbole commonly uttered during an angry outburst. Nor has Garbarino Sr made any racially and physically threatening remarks to Martinez since the time of the office confrontation. See Martinez Depo at 72:1–9. And, quite tellingly, Martinez has continued to work for MSS, apparently up to the present date—in spite of the facts that Garbarino Sr allegedly insulted him and that Martinez has filed a lawsuit against his employer. In light of these facts, it would be difficult conclusively to find that Garbarino Sr's alleged racially harassing behavior unreasonably interfered with Martinez' work performance. The fourth factor thus does not tilt in favor of either party.

On balance, however, the four factors tilt in Martinez' favor. To find a hostile work environment claim actionable, the court is not required to conclude that all four factors favor the plaintiff. Given the unusual severity of at least one of the threats, the physical intimidation associated with that threat and the public humiliation caused by the other threats, the court cannot conclude that Martinez' hostile work environment claim is insufficient.

Accordingly, the court DENIES defendants' motion for summary judgment as to Martinez' hostile work environment under § 1981.

### 2

The court turns to Martinez' failure to promote claim. Defendants assert two grounds on which they contend summary adjudication of this claim is appropriate. First, defendants argue that the claim is barred by the relevant statute of limitations. Mot Sum Judg at 10:18–11:16. Second, defendants contend that summary adjudication is appropriate because defendants had a legitimate, nonpretextual reason for not promoting Martinez. *Id.* at 11:17–12:6. Martinez does not dispute the substance of these arguments; rather, Martinez argues that defendants have unnecessarily attempted to limit his § 1981 claim to a failure to promote claim, rather than a racial harassment/hostile work environment claim. Opp Mot Sum Judg at 24:6–22.

### a

■■■ The court first addresses defendants' argument that Martinez' claim is time-barred. As the court has previously noted, actions brought pursuant to § 1981 are governed by California's personal injury statute of limitations, which provides a one-year period for suits filed before January 1, 2003. *Taylor,* 993 F.2d at 711; *Abreu,* 284 F Supp 2d at 1256. A cause of action for discrimination accrues when the alleged act of discrimination occurs. In the context of promotion decisions, a discrimination claim accrues at the time the employee is notified of the decision not to promote him. *Dugan v. Ball State University,* 815 F.2d 1132, 1134–35 (7th Cir. 1987). Thus, the aggrieved employee must file his failure-to-promote claim within one year of learning that he has not been promoted.

In the case at bar, any claim Martinez may have for failure to promote is barred as falling outside the statutory period. To be timely, Martinez must have learned on or after September 7, 2000, that defendants had rejected his application and were not going to promote him. Martinez alleges that he applied for a position delivering debris boxes, which he contends would have been a promotion. See Martinez Depo at 43:13–14. Martinez claims that he last applied for such a position "during the last three or four years" before his February 15, 2002, deposition. *Id.* at 49:3–13. But Martinez does not remember during which *specific* year he last applied for the position and does not *specifically* contend that he applied for such a position in 2000 or 2001. See *id.* Martinez also does not present any evidence that he learned of the denial of his applications on or after September 7, 2000. Garbarino Jr, however, attests that Martinez did not complete the mandatory training that was required for permission to apply for a transfer to a box driver position in 1999, 2000 and 2001. Decl David Garbarino (Gabarino Jr Decl; Doc # 41) at 1 ¶ 3. Because Martinez fails to present any proof that he applied or learned of his rejection on or after September 7, 2000, the evidence does not support a reasonable inference that Martinez applied for the debris box delivery position or that he learned of his rejection within the statutory period. Accordingly, defendants are entitled to summary judgment on Martinez' failure to promote claim on the basis of the statute of limitations.

b

Even were defendants not entitled to summary judgment on the failure to promote claim based on the statute of limitations, defendants would still be entitled to summary judgment on this claim. As the court has previously noted, the standards articulated under Title VII govern employment discrimination claims brought pursuant to § 1981. *Manatt,* 339 F.3d at 797. Title VII provides that "[a]ll personnel actions affecting employees or applicants for employment * * * shall be made free from any discrimination based on race * * *." 42 USC § 2000e–16(a). Plaintiff must establish a claim for failure to promote in violation of Title VII by presenting evidence that "gives rise to an inference of unlawful discrimination" with respect to that failure to promote. *Vasquez,* 349 F.3d at 640. Such evidence may either be direct evidence of discriminatory intent or follow the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Direct evidence is "evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Vasquez,* 349 F.3d at 640 (internal quotation and citation omitted). Martinez presents no direct evidence that the decision not to place him in the debris box delivery position was made with discriminatory intent. Thus, defendants are correct that the proper framework for evaluating Martinez' failure to promote claim comes from the burden-shifting scheme, which was elucidated in *McDonnell Douglas.*

Under *McDonnell Douglas,* Martinez must first establish a prima facie case of racial discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; see *Aragon v. Republic Silver State Disposal, Inc.,* 292 F.3d 654, 658 (9th Cir.2002). To make such a prima facie showing with respect to his termination, Martinez must show that: (1) Martinez belongs to a protected class; (2) Martinez was qualified for the employment position for which he applied; (3) Martinez was subjected to adverse employment action (i e, he was not promoted); and (4) similarly situated individuals who did not belong to Martinez'

protected class were treated more favorably. See *Aragon,* 292 F.3d at 658; see also *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Martinez need only produce "minimal" evidence to meet this showing for summary judgment purposes. See *Aragon,* 292 F.3d at 660 (describing plaintiff's burden with respect to the prima facie showing as "minimal"); *Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1124 (9th Cir.2000) (finding that employment discrimination plaintiffs need produce "very little evidence" in opposing defendant's motion for summary judgment).

Should Martinez carry his burden with respect to the prima facie case of race discrimination, the burden of production shifts to defendants to articulate a legitimate, nondiscriminatory reason for not promoting Martinez. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Aragon,* 292 F.3d at 658. Should defendants articulate such a reason, Martinez must then demonstrate that this reason is a pretext for unlawful discrimination. Martinez may prove this by producing evidence that "either directly persuad[es] the court that a discriminatory reason more likely motivated the employer or indirectly * * * show[s] that the employer's proffered explanation is unworthy of credence." *Chuang,* 225 F.3d at 1124; see also *Aragon,* 292 F.3d at 658–59. Martinez' evidence in this regard must be both *"specific and substantial"* to defeat the legitimate, nondiscriminatory reason proffered by defendant. *Aragon,* 292 F.3d at 659 (emphasis in original). Although the burden of production shifts under the *McDonnell Douglas* framework, the ultimate burden of persuasion remains at all times with Martinez. *Id.* (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

■ Here, defendants have met their burden to set forth a legitimate, nondiscriminatory reason for not promoting Martinez to the box delivery position. Martinez failed to take the required training courses that would have made him eligible to apply for the debris box delivery position. Garbarino Jr Decl at 1 ¶ 3. Martinez has pointed to no specific evidence that rebuts defendants' proffered reason for not promoting him. Accordingly, defendants are entitled to summary judgment on Martinez' § 1981 failure to promote claim on this basis as well.

### 3

■ Defendants also contend that summary adjudication of Martinez' hostile work environment claim under FEHA is appropriate. California courts have found that "despite the difference in statutory language, in light of the parallel antidiscriminatory objectives, the California courts [are] guided in their interpretations of FEHA by the federal court decisions interpreting Title VII." *Etter v. Veriflo Corp.,* 67 Cal.App.4th 457, 464, 79 Cal.Rptr.2d 33 (1998). And with respect to harassment claims, "California courts have applied the federal threshold standard to claims of * * * harassment and held that FEHA is violated when the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment." *Id.* at 465, 79 Cal.Rptr.2d 33 (internal quotation and citations omitted). Given the fact that FEHA decisions may rely on federal harassment standards, the court's finding of an actionable hostile work environment claim under § 1981 precludes summary judgment on Martinez' FEHA claim. Thus, defendants' motion for summary judgment on Martinez' FEHA claim is DENIED.

### IV

Having found that Martinez may properly pursue a hostile work environment claim

under § 1981, defendants' motion to decline supplemental jurisdiction over the four state law claims must be denied. As a threshold matter in the decision whether to decline supplemental jurisdiction, the court must identify "a factual predicate that corresponds to one of the [28 USC § ] 1367(c) categories [permitting the court to decline jurisdiction]." *Executive Software North America, Inc. v. United States District Court*, 24 F.3d 1545, 1557 (9th Cir. 1994). Section 1367(c) provides that the court may decline to exercise supplemental jurisdiction over pendent state claims in four circumstances: (1) when the state claim or claims raise a "novel or complex" state law issue; (2) when the state claim or claims "substantially predominate[ ]" over the federal claims; (3) when the court has dismissed all federal claims; and (4) in "exceptional circumstances" that provide "compelling reasons" for declining jurisdiction. Defendants' sole argument pertaining to the predicate § 1367(c) categories is that the court should grant the motion for summary judgment on Martinez' § 1981 claim and thus all federal claims would be dismissed from the suit. See Mot Sum Judg at 13:2–21. Given that the court has found that Martinez has an actionable § 1981 hostile work environment claim, defendants' motion to decline supplemental jurisdiction must be DENIED.

## V

In sum, the court GRANTS defendants' motion for partial summary adjudication on Martinez' failure to promote claims under § 1981 (Doc # 42). The court DENIES defendants' motion for partial summary adjudication on Martinez' hostile work environment claim under § 1981 and FEHA (Doc # 42). The court also DENIES defendants' motion to decline sup-

plemental jurisdiction over Martinez' state law claims (Doc # 42).

IT IS SO ORDERED.